UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DINO DIXIE, ELI SMITH, and CHEYENNE TALBERT,<br><br>PLAINTIFFS,<br><br>vs.<br><br>ROBERT E. ANTONACCI, III, and THE COUNTY OF ONONDAGA,<br><br>DEFENDANTS. | Index No.   5:16-CV-1221 (FJS/TWD)<br><br>ECF CASE<br><br>COMPLAINT |

Plaintiffs Dino Dixie, Eli Smith, and Cheyenne Talbert ("Plaintiffs") allege the following based upon personal information and belief and upon the investigation by counsel:

## NATURE OF THE ACTION

1.      This is a civil rights action brought pursuant to the United States Constitution, as amended, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.  Plaintiffs seek redress for the actions of Defendants Onondaga County ("County") and, in particular, Onondaga County Comptroller Robert E. Antonacci, III ("Defendant Antonacci")(collectively, "Defendants"), taken under color of state law, that deprived and continue to deprive Plaintiffs and others of their civil rights, privileges and immunities secured by the Constitution and the laws of the United States.

2.      Defendants have instituted and enforced a policy, practice and custom pursuant to which minority-owned businesses and their owners have been subjected to the discriminatory practices of Defendant Antonacci.  Defendant Antonacci has created a hostile environment for minority-owned businesses by abusing the power of his office and singling out minority contractors through surprise inspections, withholding payments, and other antagonistic acts. Despite multiple complaints about this intimidating and oppressive behavior, Defendant

Antonacci's conduct has not changed and has had a chilling effect upon minority-owned businesses and resulted in many such businesses not seeking work with the County.

3.      Plaintiffs seek compensatory and punitive damages for the injuries caused by Defendant Antonacci's unlawful conduct as well as injunctive relief to cease Defendant Antonacci's discriminatory practices.

## JURISDICTION AND VENUE

4.      This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which confers upon the Court original jurisdiction over all civil actions arising under the laws of the United States, and 28 U.S.C. § 1343(a), which confers upon the Court original jurisdiction over any civil action authorized by law to be commenced by any person to recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights.

5.      This Court has jurisdiction over the County and Defendant Antonacci because the wrongdoing alleged in this Complaint took place in the State of New York *"NYS") and because the County is located in New York.

6.      Venue in this District is proper pursuant to 28 U.S.C. § 1391 because both the County and Defendant Antonacci are located in this District, the acts complained of herein took place in this District, and because the County and Defendant Antonacci are subject to personal jurisdiction in this District.  Venue is also proper in this District because Plaintiffs reside within this District.

## THE PARTIES

7.      Plaintiff Dino Dixie, at all relevant times mentioned in this Complaint, has been a resident of Syracuse, New York.  Mr. Dixie owns and operates 1st Point LLC ("1st Point"), a full

2

service construction management company. Mr. Dixie has been in the construction industry since 1989 and started 1st Point in 2012. 1st Point is a certified MBE with the City of Syracuse and the State of New York with five full-time employees including Mr. Dixie, made up of three African American and two non-minority employees.

8.      Plaintiff Eli Smith, at all relevant times mentioned in this Complaint, has been a resident of Syracuse, New York. Plaintiff owns and operates So Gone Trash Removal LLC ("SGTR"), founded in 2013 and E. Smith Contractors LLC, ("E. Smith Contractors") founded in 2014 (together the "Smith Companies"). The Smith Companies are located in the South Side Innovation Center ("SSIC"), a small business incubator which is managed by the Whitman School of Management at Syracuse University. Under the guidance of SSIC, the Smith Companies successfully attained government certifications allowing them to do business as certified minority and/or small businesses with the federal government and several states and their subsidiaries. Mr. Smith also became one of the very few minority contractors in Onondaga County to get approved for bonding. Most federal and state construction contracts require a surety bond when bidding as a condition of the contract award. Thus, to compete for larger construction contracts a M/WBE must be bonded. With the assistance of the SSIC, the Smith Companies not only were bonded by New York State for $1 million, they were also bonded by the United States Small Business Administration for $10 million. The Smith Companies successfully attained government certification allowing them to do business as certified minority and/or small businesses with the federal government and several states and subsidiaries including, but not limited to the United States Small Business Administration (8)a Disadvantaged Business Program, (MBE), the City of Syracuse MBE program, the Commonwealth of Pennsylvania Small Diverse Minority Business program, and the State of

North Carolina Department of Transportation Disadvantaged Business Enterprise program. The Smith Companies have also been recognized as the SSIC MBE of the year in 2015 and received the first annual "Carey Gabay Excellence and Innovation Award" for M/WBE's from NYS Governor Andrew Cuomo.

9.      Plaintiff Cheyenne Talbert, at all relevant times mentioned in this Complaint, has been a resident of Syracuse, New York.  Mr. Talbert has an MBA from Syracuse University and is the owner of Cheyenne Realty Corp ("CRC"). CRC was formed in 2004 and engages in residential property management services of one to three family homes and parking lot management for Onondaga County. CRC is a minority owned business, owned by an African-American male and has one employee, also an African-American male.

10.     At all times mentioned herein, Defendant County was and is a public entity. Onondaga County is located in the center of New York State and is home to the city of Syracuse. In 1962, voters approved the County Charter and elected its first Onondaga County Executive. The current Onondaga County Executive is Joanne M. Mahoney ("County Executive Mahoney") who has held this office since January 2008.

11.     The current County Comptroller is Robert E. Antonacci, III who has held this office since January 2008.

12.     Defendant Robert E. Antonacci, III, at all relevant times mentioned in this Complaint, served as Onondaga County Comptroller, an elected office independent of other elected officials of Onondaga County.  Defendant Antonacci is also a resident of New York State.

789627

## FACTUAL ALLEGATIONS

I.     **SUMMARY BACKGROUND**

13.     The roles and responsibilities of the Onondaga County Executive are set forth in the Onondaga County Charter and Administrative Code.  Such responsibilities include the ability to "approve a uniform system for the procurement of goods and services by the County and all its units, oversee its implementation and the purchase and sale of all materials, supplies and equipment therefor…" Onondaga County. Admin. Code Art. III, § 3.02(j) (2010), Onondaga County. Charter Article III, § 302(k) (2010).  Onondaga County has been predominately run by white males both as County Executives and as County Comptrollers since 1962.  The current county executive, however, has put in place a program to encourage minority-owned businesses to bid for County work both to increase such participation and to encourage minority-owned businesses in Onondaga County.  The County's official policy is to create opportunities for minority-owned businesses in government contracting to address the past discrimination against such minority owned business enterprises ("MBEs") and to set a good example with MBE leaders in order to encourage other MBEs to serve as vendors to the County as well.

14.     Unfortunately, during the past few years, the customs and practices that have been adopted in the County, and particular by the Comptroller's Office, have contradicted the County Executive's program and, instead, continued the historic discrimination in government contracting.

15.     Defendant Antonacci is unsupervised, thus has final policymaking authority for the County through his practices.  He has a contrary policy of discouraging MBE's from serving as vendors to the County and protecting and favoring non-MBEs (*i.e.*, white-owned businesses) as vendors to the County.  Defendant Antonacci has exercised final County policymaking

5

authority to cause the County to commit the official acts complained of herein, promoting his policy of protecting and favoring white-owned businesses at the expense of MBEs, and thus has caused the County to discriminate against MBEs in violation of the County's official policy of promoting MBEs and in violation of the law.

16.     Participation by minority-owned businesses has been stymied by Defendant Antonacci, who and continues to engage in intentional practices and conduct designed to discriminate against minority businesses awarded contracts with the County. Defendant Antonacci has targeted minority businesses by creating a custom and practice of intimidation and harassment through oppressive tactics. These oppressive tactics have been applied to minority contractors that he has specifically segregated out while other similarly situated non-minority owned businesses have not suffered the same fate. His actions have included the public and private degradation, humiliation, and personal intimidation of the minority-owned contractor's principals and their employees, as well as the purposeful delay of payments through either unnecessarily dissecting aspects of minority-owned contractor deliverables even after the work has been approved by the County or segregating out payments to minority-owned contractors, which have resulted in significant financial damage. Most disturbing is Defendant Antonacci's intimidating, berating, oppressive, unrelenting, and harassing behavior that has had a chilling effect upon minority businesses resulting in these businesses no longer seeking work with the County.

A.     **Legal and Historic Background**

17.     President John F. Kennedy issued the first Executive Order in 1963 requiring certain companies that did business with the federal government to not discriminate against prospective employees or employees based upon race or ethnicity.  This Executive Order was

followed up an Executive Order issued in 1965 by President Lyndon B. Johnson who created the

Office of Federal Contract Compliance, tasked with increasing employment opportunities for

minorities by requiring federally funded construction contractors to hire minorities.

18.     To further combat the economic and social disadvantages stemming from prior

discrimination against minorities, the federal government, in 1983 under the direction of

President Ronald Reagan, expanded its initiatives beyond contractor hiring practices by

implementing a program that encouraged minorities to operate their own businesses so they can

bid as prime and sub-contractors rather than hope just to be hired by a non-minority contractor in

a subordinate capacity. This program is referred to as the Disadvantaged Business Enterprise

("DBE") program. Since its inception the DBE program has evolved to include women-owned

businesses and has been modified to address United States Supreme Court cases that required the

DBE program to meet the judicial test of constitutional strict scrutiny.[1]

19.     The State of New York adopted its first minority and women-owned business

enterprise ("M/WBE") program in 1988 that promoted state contracting opportunities to both

minority-owned business enterprises and women-owned business enterprises ("WBE") so they

may bid as prime contractors or participate as sub-contractors for contracts to provide goods

and/or services that were administered by the State of New York.  In response to constitutional

strict scrutiny challenges brought against NYS since the inception of its M/WBE program, NYS

commissioned a study conducted by NERA Forensics Consulting to survey the existence of

discrimination and participation of M/WBE's in state contracting opportunities. The study titled

*State of Minority-and Woman-Owned Business Enterprise: Evidence from New York* (the

---

[1] ERWIN CHEMERINSKY, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES 529 (1997)("Under strict scrutiny a law is upheld if it is proven necessary to achieve a compelling government interest. The government... must show that it cannot achieve its objective through any less discriminatory alternative.").

"NERA Diversity Study") was finalized in April 2010. The results of the NERA Diversity Study concluded that:

> MWBE's are present in substantially lower numbers and were substantially more likely to be denied access to credit than would have [been] the case if the market operated in a race and gender neutral manner. It further found that during the period of April 2004 to March 2008, MWBE's were utilized in state contracting at rates far lower than their availability would indicate. The authors of the study determined that the statistical and anecdotal evidence support the conclusion that these outcomes are the result of discrimination. In short, the study powerfully demonstrates the need for a robust New York State program to ensure a level playing field of MWBE's.

*New York State Governor David Patterson, Cover Letter to NERA Diversity Study, May 2010.*

20.     The findings of the NERA Diversity Study provided a strong foundation justifying why NYS should have a robust M/WBE program while simultaneously blunting any future constitutional strict scrutiny challenges. In response to the NERA Diversity Study's outcomes, NYS began to affirmatively address past discriminations in government contracting.

## II.     MINORITY-OWNED BUSINESS CERTIFICATION

21.     To remedy discrimination, federal, state and local governments across the United States ("US") have implemented DBE and MBE programs designed to create economic opportunities for small, minority-owned businesses. These programs require minority-businesses to be certified as a DBE/MBE. Certification provides DBE/MBE's the opportunity to gain work from a government awarded contract as a prime contractor, or subcontractor on a contract awarded to another prime contractor, when the contract has a mandatory MBE participation requirement. Onondaga County does not have its own minority business certification process so it accepts the certification of minority companies approved either by the federal government through the DBE certification process, the state government through its MBE certification process, or the City of Syracuse through its MBE certification process.

789627

### A.    MBE- City of Syracuse Certification

22.    The Syracuse MBE Participation Program requires that the business be at least 51% owned and controlled by minority members, management and daily operations of the business are controlled by one or more of the minority members who own it, the company be in business for at least nine (9) months prior to certification, and requires the principal operation of the business or a permanently staffed office(s) of the business are located within Onondaga County.

### B.    MBE- New York State Certifications

23.    The New York State MBE Program requires that the minority business be independently owned, operated and be controlled by minority members, each minority owner must not have a personal net worth in excess of $3.5 million, the business must be a small business and not have more than 300 full time employees, and the business must be actively managed for at least one year.

### C.    DBE- Federal Government Certification

24.    The federal government program, DBE, is run by the US Department of Transportation ("DOT"). The program is designed to remedy ongoing discrimination and the continuing effects of past discrimination. The primary goal of the program is to "level the playing field" by giving socially and economically disadvantaged businesses a fair opportunity to compete for federally funded contracts. To be eligible to qualify as a DBE, the business must be a small business; it must not have annual gross receipts over $23.98 million in the previous three fiscal years; the disadvantaged person must have a personal net worth of less than $1.32 million; the business must be independent and not tied to another firm; and the person must have the power to direct or control the management of the firm.

789627

III.   **THE COUNTY PROCUREMENT PROCESS**

25.     When the County requires the provision of goods and/or services, it can turn to the County's external workforce *i.e.* those in the Onondaga County community outside of County government service.  Through its procurement process the County can award contracts in two ways: 1) it can award a contract to a vendor if the contract is below a certain threshold or 2) develop a request for proposal ("RFP") that lists the scope of work the County is seeking and the bidding requirements.

26.     RFP's are internally reviewed by the County department that will be managing the provision of goods or services, who in consultation with the County Division on Purchasing select the winning bidders.  The County also requires all selected bidders to be "responsible bidders."[2] The goal is to select the bidder that submits the lowest responsible bid, however, if the lowest bidder is deemed a non-responsible bidder, they are disqualified. Following the award of the contract, the County department charged with oversight and management of the procured goods/and or services reviews all of the project's deliverables, as well as approves all related invoices and payments.  Winning bidders are then issued an award letter with an accompanying contract and thereby made a County contractor ("Contractor").

IV.   **ANTONACCI'S DISCRIMINATORY POLICIES AND PRACTICES TOWARD MINORITY-OWNED BUSINESSES**

27.     Despite the systems and policies in place to effectuate a "level playing field" for minority-owned businesses in Onondaga County, Defendant Antonacci as a policymaker for the County has purposefully and deliberately engaged in concerted conduct to delay payments

---

[2] For example, NYS Executive Order 170 lists examples of what can be deemed a non-responsive bidder, including but not limited to: "criminal conduct in connection with government contract or the conduct of business activities involving …. fraud … embezzlement, or other comparable crimes, … serious moral turpitude, fundamental lack of integrity, or knowing disregard for the law. Evidence of such conduct may include … a connection with … the bidder or proposed subcontractor, any director or officer, or any holder of five percent or more of the shares or equity of the bidder or proposed subcontractor, or any affiliate of the bidder or proposed subcontractor."

789627

rightfully owed to minority businesses and engaged in oppressive tactics to harm minority business owner's reputations in order to dissuade and embarrass them from doing business with the County in the future. As detailed below, Defendant Antonacci's discriminatory custom, practice and policy has injured Plaintiffs Dino Dixie, Eli Smith and Cheyenne Talbert as well as their companies, which constitute three of the seven minority-owned prime contractors contracted to do business with the County, and this custom and practice needs to be enjoined lest it continue to injure the Plaintiffs and other minority-owned businesses that wish to conduct business with the County.

A.     **DINO DIXIE, 1ST POINT LLC**

28.     Mr. Dixie bid on his first request for proposal, *Facilities Management-Construction Management Services* ("Construction Management RFP"), with the County in 2013. The Construction Management RFP was issued by the Onondaga County Department of Facilities ("Facilities") in an effort to select a panel of contractors with varying skill sets to be available to provide services on future projects. In 2013 seven responsible bidders, including 1st Point, were selected to be on the panel of contractors. 1st Point was the only minority-owned business on the panel. After the panel was selected and when projects became available, Facilities either assigned projects to panelist or issued a mini-bid to the panelists to compete against each other, and the lowest bidder would most often prevail and be selected to work on the designated mini-bid project. 1st Point we selected as a prime-contracts for seven County projects as a result. Moreover, 1st Point also won contracts not associated with this RFP and served as a sub-contractor to other prime contractors who did business with the County. The projects was selected for 1st Point won via the RFP included various projects related to the Onondaga County Library, Everson Parking garage, Van Dyne Hospital, Upstate Hospital, and the Village of Solvay. The type of work performed varied from project to project including demolition, value

11

engineering, building construction and management and inventory design. The contract entered into between 1st Point and the County included a provision that instructed 1st Point on the requirements of submitting invoices for reimbursement, which read:

> County shall pay [c]ontractor, in consideration of all goods, equipment, work, or services furnished by [c]ontractor under this agreement, an amount not to exceed the rates stated, as stated in the CM Positions and cost per hour incorporated and made a part of this agreement. Payments will be made to [c]ontractor based on proposal amounts accepted by any department using this contract. All payment shall be made in accordance with procedures established by the County's comptroller. *County's Facilities Department is hereby designated to act on behalf of County in directing and reviewing Contractor's services. Contractor shall report directly to Duane Owens, Commissioner, or other designee.*

All prime contractors selected via the Construction Management RFP, not just 1st Point, received this same contract, with the same provision. When 1st Point was named as a subcontractor, the prime contractor who was the contract's signatory, paid 1st Point directly.

29.     In and around early 2015, a Freedom of Information Law ("FOIL") request was submitted to the County requesting information about an unknown matter not related to Mr. Dixie. The FOIL request led the employee(s) tasked with responding to it, to the very desktop computer of the Comptroller where the employee(s) took note that the Comptroller actually had a separate electronic document folder on his desktop labeled Dino Dixie (the "Dino Dixie File"). Upon learning of the Dino Dixie File, Mr. Dixie realized that the Comptroller was watching him.

30.     Then in June 2015 a FOIL request was made by the Toby Shelley Campaign for County Executive. Mr. Shelley was running against the incumbent, County Executive Mahoney. The FOIL request inquired as to the amount of money the County paid to Mr. Dixie personally and to 1st Point.

31.     A few weeks later, the Comptroller announced via press release that he would respond to FOIL requests within forty-eight hours and that he would post the FOIL requests and

his responses to them for public viewing on his website.  The press release stated that "Mr. Antonacci decided to implement this policy after several requests were received from the Toby Shelly Campaign for County Executive." Defendant Antonacci, despite being in office since 2008, did not feel necessary to make such an announcement and policy until the FOIL request for Mr. Dixie's payments.

32.     The timing of the announcement and the sudden change of policy gave Mr. Dixie the alarming impression that the FOIL request was not actually prompted by the Shelly Campaign, but actually by Defendant Antonacci in order to develop a County custom of intimidating minority businesses through his powers as a County policymaker.

33.     After the FOIL postings and creation of the Dino Dixie File in mid to late 2015, the Comptroller continued to intimidate and harass Mr. Dixie. In heavy handed ways designed to send Mr. Dixie the message that Defendant Antonacci was watching him and was manipulating and unduly slowing down the dispatch of his payments.

34.     Mr. Dixie had various contracting projects going on simultaneously which required him to submit weekly invoices for reimbursement to ensure he maintained appropriate cash flow for his business. He submitted the invoices to the respective departments that were responsible for managing the various bid, and *most often it* was Facilities.

35.     Once received, a staff member of the Supervising Department Facilities, for instance, would review the invoice for appropriate documentation. If the submission met approval, the staff member would forward it onto his or her superior in the same department who would review it. If approved, the higher level employee would send they invoice to the Comptroller's office for payment via an electronic system that operates between the Offices of the County Executive and Comptroller (the "Payment System"). Once the Comptroller's office

received the payment approval and request for payment, the check was printed by the Comptroller's office.

36.     From 2013 to early February 2016, all checks issued by the Comptroller's office for payment to 1st Point were received in an all-in-one format in which the stub and check were all included in one document ("All-In-One Checks"), which can be viewed after tearing off the side and top perforations and unfolding the All-In-One Check.[3]  The Metered Postage Mark was placed on the exterior of the All-In-One Check by the County operated mailroom.

37.     Once the All-In-One Check was cut, the Comptroller's Office would send the check to the County operated mailroom that would place a metered postage mark ("Metered Postage Mark") on the All-In-One Checks and mail them out the same day. The front exterior of the All-In-One Checks had 1st Point's address printed on them and when received by Mr. Dixie they would have a Metered Postage Mark on the upper right corner and the name and address of the County Comptroller and his offices on the upper left corner.  The County operated mailroom does not place All-In-One Checks in additional separate envelopes as that would be counterintuitive to the purpose of utilizing an All-In-One Check and does not use stamps as it has a machine to place the Metered Postage Mark on mailings.  The County's routine custom of mailing out the All-In-One Check continued for Mr. Dixie until February 2016.

38.     On February 12, 2016 the Comptroller issued an All-In-One Check to Mr. Dixie that was mailed in a white Number 10 envelope addressed to 1st Point. The front of the white Number 10 envelope had the name of the County Comptroller and the address of his offices on the upper left corner ("Comptroller's Envelope"), a US Flag Forever Stamp on the upper right

---

[3] A version of the exterior of the All-In-One Check with a Metered Postage Mark is attached hereto as Exhibit 1.

corner, and a pale yellow label that was addressed to 1st Point in the center.[4] The address label appeared to be printed from a computer rather than typed by a type-writer and the US Flag Forever Stamp had a traditional US Postage mark cancelling the stamp, similar to what a local post office does to postage paid. Mr. Dixie opened the envelope and found an All-In-One Check addressed to him, but without the Metered Postage Mark present on all previously received All-In-One Checks. This process of mailing the unmetered All-In-One Checks in a Comptroller's Envelope affixed with a label and a US Flag Forever Stamp ("New Custom") to Mr. Dixie that began on February 12, 2016 has continued up until shortly before the filing of this Complaint, but for two exceptions, one occurring when Defendant Antonacci was out of the office.  Except for these two instances, since February 12, 2016 every payment from the County to Mr. Dixie has been sent pursuant to the New Custom up until shortly before the filing of this Complaint.

39.     Shortly after the New Custom began, Mr. Dixie reached out to the County Commissioner of Facilities ("Facilities Commissioner") and the then County Commissioner of the Department of Purchasing ("Purchasing Commissioner"), both of whom have the authority for reviewing invoices and providing approval of payments to inquire about this New Custom. Both Commissioners denied awareness of the New Custom. Mr. Dixie learned that the absence from the All-In-One Checks of the Metered Postage Mark meant that the Defendant Antonacci never forwarded it to the County operated mailroom. Instead, Defendant Antonacci purposely held back each of Mr. Dixie's payments, so that he or his employees could personally mail out the checks in line with his intimidating New Custom.

40.     Each envelope containing All-In-One Checks beginning February 12, 2016 had the same pale yellow label with 1st Point's address appearing using the same margins and the

---

[4] A version of exterior of the All-In-One Check and the Comptroller's Envelope as sent with the New Custom is attached hereto as Exhibit 2.

exact same font style, font size, check after check. The symmetry of every label on the Comptroller's Envelopes illustrated that Defendant Antonacci facilitated his intentionally intimidating policy by printing out an entire page of adhesive mailing labels just for Mr. Dixie, which was kept in his office to attach to the Comptroller's Envelope after he segregated out Mr. Dixie's check from the batch of printed All-In-One Checks for non-minority businesses that were on their way to the County operated mailroom for routine mailing.  The Comptroller conveniently kept the electronically printed labels in his "Dino Dixie" folder.

### B.    ELI SMITH, OWNER OF SO GONE TRASH REMOVAL LLC & E. SMITH CONTRACTORS LLC

41.    In the fall of 2015, the County put forth a series of contracting opportunities that Mr. Smith was encouraged by Facilities to bid for.  This was because the County government other than Defendant Antonacci, but like the SSIC, saw the need to encourage minority-owned businesses operating in the South Side of Syracuse and neighboring communities to be considered for County projects. The County, again other than Defendant Antonacci, also saw this as an opportunity to set an example that working with the County is desirable for all minority-owned businesses. The County's objective was that if they set a good example with a few minority-owned business leaders it may encourage others to step up and serve as MBE vendors to the County as well. Thus, creating opportunities to address the past discrimination against minority-businesses in government contracting that was identified in the NERA Diversity Study.

42.    The Smith Companies responded to a few contracting opportunities and were awarded three contracts. The contracts were for a painting project at the Hutchings Psychiatric Center ("Hutchings"), a bathroom renovation for the County's Department of Health at a building referred to as the Civic Center ("Civic Center"), and the repainting of the Onondaga War Memorial ("War Memorial"). All were to be completed between late 2015 and early 2016.

16

43.     As a small business, and as Defendant Antonacci well knew, the Smith

Companies relied upon the County contract payments to pay the employees that worked on the

County projects. On November 11, 2015 the County Facilities Department issued a purchase

order for the Hutchings project for $7,500 and revised it to $12,800 on December 17, 2015. On

November 24, 2015 the County issued a purchase order for the bathroom renovation at the Civic

Center totaling $7,849.  On January 5, 2016 the County finalized the $63,000 award Contracts

for the War Memorial project.  All were promptly issued to Defendant Antonacci's Office.

44.     E. Smith Contractors began work at Hutchings the week of December 14, 2015

and completed the work during the week ending December 26, 2015, excluding the door

installation, which was agreed to be done later when the custom door arrived with no delay in

payment. E Smith Contractors submitted an invoice for payment on December 17, 2015 for

$5,062.50 and then submitted a follow-up invoice for $5,899.50 on December 26, 2015, well

within the authorized amounts.

45.     E. Smith Contractors began work on the Civic Center the week of January 11,

2016 and submitted an invoice to Facilities for $7,849 on January 14, 2016.  The above invoices

were submitted on the County approved form.

46.     The County department that issues the contract is responsible for monitoring the

contractor's performance and scrutinizing the submitted invoices.  The Comptroller's role is to

issue the contractually required payment. According to statements made by Defendant Antonacci

to Mr. Smith, at a meeting noted later in this Complaint, the practice of Comptroller is to issue

payment for invoices that were received in his office by Tuesday on Friday of that same week.

47.     Mr. Smith did not receive payment on the appropriate Fridays after his invoices

were submitted by Facilities.  Mr. Smith reached out to Facilities to inquire about the status of

789627

his payments, which prompted Facilities to contact the Comptroller. Defendant Antonacci advised Facilities that he refused to pay E. Smith Contractors for the Hutchings project until the door was delivered and installed and that the invoice submitted for the Civic Center project was rejected since it was not sent to the Comptroller in the Comptroller's preferred format. E. Smith Contractors had submitted its invoice for the Civic Center project on the County approved form bidders use to submit invoices. However, Defendant Antonacci wanted E. Smith Contractors to resubmit the invoice on company letterhead rather than the County approved "Application and Certificate Payment" form, an issue that had never been raised previously.

48.     In response to the Defendant Antonacci's two reasons for withholding payments, Facilities advised the Comptroller that it is not within his jurisdiction to audit a contractor's work performance and that they approved payment for Hutchings since all of the work was performed, with the exception of the delivery of the door where facilities had agreed that Mr. Smith had no control over that aspect of work and would be paid prior to its installation. Facilities also had Mr. Smith re-submit the Civic Center invoice on E Smith Contractors letterhead referencing the same exact payment amount as was submitted weeks earlier on the County approved form.

49.     The delayed payments to Mr. Smith were adding up, as was Mr. Smith's debts to his employees, his payroll service provider and worker's compensation policy provider. His employees also began to lose faith in his ability to pay them and began leaving his employ, affecting his reputation within the community as a reliable employer. The Facilities and Purchasing Commissioners understood the financial impact that Defendant Antonacci's behavior was having upon the Smith Companies, and pressed the Comptroller to issue a check on Friday, January 29, 2016, since the invoices were submitted earlier that week and Facilities and Mr. Smith seemed to have overcome the Comptroller's earlier objections.

50.     On the date of the anticipated payment, the Comptroller's office continued to deny issuing the payment to Mr. Smith, and gave Mr. Smith the impression that he may have to wait at the mercy of the Comptroller. After the County offices closed, Defendant Antonacci called his staff and allowed them to release the check that evening.  Although the check was already cut and issued, Defendant Antonacci chose to delay delivery to Mr. Smith and hamper his businesses further. Since the check was released after County offices closed on Friday, the payment would not be mailed until Monday, causing additional financial and emotional duress on Mr. Smith. Upon learning of the release of the payment that the Comptroller deliberately segregated from all other payments made on that date and maliciously withheld, Facilities contacted Mr. Smith and told him that he should come down to the County offices to personally pick up his long overdue contractually obligated payment that very evening. The payment totaled $20,028.50, which finally included all overdue payments for the approved services for the Hutchings and Civic Center projects.

51.     Defendant Antonacci's efforts to exceed his legal authority continued with the awarding of the War Memorial project to E. Smith Contractors.  After Mr. Smith was officially, but belatedly, notified that the War Memorial project was awarded to him on January 5, 2016, he was mindful that the project still needed to be completed in three weeks by January 27, 2016. In order to facilitate the completion of the stadium's interior painting project, Facilities made two decisions: first, they offered to pay overtime wages to E. Smith Contractors and second, they decided to allow County employees who work for Facilities to assist with the painting if necessary.  Facilities also issued a change order for the contract award increasing the contract from $63,000 to $75,000 to compensate for anticipated overtime costs.

789627

52.     As required, E. Smith Contractors submitted invoices to Facilities on a rolling-basis. The first invoice for the War Memorial was submitted on January 21, 2016 for $22,325 and January 29, 2016 for $16,407.45. Facilities approved both invoices and the Comptroller issued both payments in one check on February 5, 2016 totaling $38,732.45.

53.     However this payment was not sent to County's mailroom for mailing or personal pick-up by Mr. Smith, it was mailed out by the Comptroller in the aforementioned New Custom, with its own separate envelope, label, and stamp, ominously indicting that Defendant Antonacci was watching

54.     Mr. Smith submitted the next two invoices on February 10, 2016 for $2,227.20 and February 16, for $3,465. Facilities approved the payment and Defendant Antonacci issued a check on February 19, 2016 for $5,692.80. This payment to Mr. Smith was again sent via the New Custom with the personal attention of the Comptroller. The next two checks made to E. Smith Contractors were issued on March 4, 2016 for $2,024.62 and March 11, 2016 for $4,607.50 and were also received via the New Custom. The final payment that was issued on April 1, 2016 for the $10,138.79 was also personally mailed out by the Comptroller but it was given a different treatment. It was mailed as an All-In-One Check, without the use of a second Comptroller's Envelope, but it was still affixed with a stamp from the Comptroller's Forever Stamp book, the same stamps used previously for all of the other New Customs checks sent to Mr. Smith and Mr. Dixie. Even though this payment was not entirely sent via the New Custom, it still indicated disparate treatment because if the All-In-One check had been sent to the County's mailroom it would have been affixed with the Metered Postage Mark and not a stamp.

55.     During these projects, Mr. Smith was subject to a pattern of harassment by Defendant Antonacci such as showing up personally at the work site to harass and "audit"

20

without reasonable notice.  As the accelerated painting schedule was proceeding at the arena,

Defendant Antonacci personally showed up wearing his County Comptroller jacket and showed

a badge identifying himself to a junior painter. He did not ask for the manager or foreman,

instead, he stood there asking the painter questions about each of those present while he noted

how many were employed by E. Smith Contractors versus the County. After the Defendant

Antonacci left, the painter who was startled by the Comptroller's intimidating and unauthorized

presence, alerted Mr. Smith who then alerted Facilities to the incident. Facilities once again

advised Mr. Smith that Defendant Antonacci was exceeding his authority and that his behavior

was a form of harassment that now only seemed to apply to African-American males doing

business with the County.  Indeed, this harassing pattern of behavior of surprise visits by

Defendant Antonacci also occurred to Mr. Talbert, a plaintiff whose experiences are described

below.

     56.    It was not until March, when over $10,000 in outstanding payments were still not

paid by the Comptroller for a job that was completed in January, properly invoiced and approved

by Facilities, that Mr. Smith felt it necessary to meet with Defendant Antonacci.  Mr. Smith sent

an email requesting a meeting with Defendant Antonacci in order to better understand how to

work with him, adding a plea that

> *As a result of all payment issues experienced over the past few*
> *months my overall construction operations has been crippled and*
> *cash flow significantly reduced. At this point I do not know where*
> *to turn for answers. Therefore I would like to… seek your*
> *professional guidance…*

*March 4, 2016 email from Eli Smith to bobantonacci@ongov.net*

     57.    Defendant Antonacci personally responded and invited Mr. Smith to meet with

him the following Monday, March 10 at 10 am.  During their meeting, Defendant Antonacci

advised Mr. Smith that he received complaints of fraud being committed by Mr. Smith, stating

789627

that there have been serious questions raised about the work done at the War Memorial. These aspersions were in fact contrary to the fact that Syracuse Crunch Management advised Mr. Smith that he had done a good job. Defendant Antonacci also advised Mr. Smith that in his nine years as Comptroller, Mr. Smith was the first vendor to complain about his procedures.

58.     During the delayed payments which continued into April, Mr. Smith suffered further financial and reputational damages while suffering emotional duress. Mr. Smith, who has effectively built a small minority-owned contractor business and is one of very few minority-owned contracting firms in Onondaga County to be bonded, has decided to no longer bid on any other projects with the County rather than continue facing further financial and reputational damage at the hands of the Defendant Antonacci.

> At this time, E. Smith Contractors LLC WILL NOT bid on any more County projects nor can I [in] good faith...have fellow business owners in the community. . . do business [with the County] because I know how Mr. Antonacci does business.

June 28, 2016 email from Eli Smith to several Onondaga County public officials, etc.

59.     Mr. Smith, like Mr. Dixie, was subjected to the New Custom treatment, a practice that was only conducted towards African-American male business owners who had recently received work with the County.  In conjunction with the other harassing behavior, the New Custom was and still is, the Defendant Antonacci's way of advising both minority business owners that he is watching them.

### C.     CHEYENNE TALBERT, CHEYENNE REALTY CORP

60.     In 2014, CRC bid on the RFP for Department of Facilities Management, Parking Lot Management Services ("Parking Lot Management Services RFP") released by Onondaga County, after being sent the proposal by the County to encourage Mr. Talbert to bid. The Parking Lot Management Services RFP sought a company to manage three County owned parking lots:

789627

the A, B and D lots, totaling about 278 parking spots.  The previous contract holder for Lots A, B and D was Murbro Parking Inc. ("Murbro"). Murbro had its contract rescinded because it failed to make its monthly payments to the County and within a nine month period accrued over $198,000 in underpayments to the County. Indeed, Onondaga County won a judgment against Murbro to pay the almost $200,000 owed to the County at a rate of $3,000 per month. Around the time of the public controversy related to Murbro, the general manager of Murbro, David Gross, began his own parking management company, Syracuse Parking Services, and placed a bid on Lots A, B and D, for $16,500.00 per month. However, Syracuse Parking Services bid was disqualified by the County's Division on Purchasing as being an irresponsible bidder for two primary reasons. First, the $16,500 payment per month to the County was unrealistically similar to the previous commitment made, but never met, by Murbro. And second, because David Gross had and still has an undeniable personal and professional connection to Murbro, thereby making the bid of the Syracuse Parking Services a mere corporate shell game.

61.    CRC bid $8,000 a month and was selected as the winning bidder to manage lots A, B and D for three years in November 2014. Shortly after the commencement of the County contract, CRC began managing Lots, A, B & D and making $8,000 monthly payments to the County on the 10th of every month. CRC is also required to submit quarterly reports detailing revenue generated from special events held at the parking lots after normal operating hours. CRC rents out both daily and monthly spots. The monthly price per spot that CRC can charge is determined by the County. The price ranges from $64.80 to $21.00 for monthly parking passes. One lot, the *A* lot, is for County workers and CRC is not able to charge County workers for their spots. The only potential profit CRC is able to generate from Lot A is if a special event is held in

the area.  Mr. Talbert has never missed a payment nor has he ever been late for a payment and he

is up to date in his quarterly filings detailing revenue from special events.

62.     Just a few short months after Mr. Talbert won the bid, Defendant Antonacci

began to take action against CRC and in an attempt to have the contract rescinded, he conducted

an audit of CRC that the Comptroller publically released in November 2015. Of the over fifty

audits published on the Comptroller's website from January 1, 2014 to the present the audit of

CRC appears to be the only one against a vendor of the County.

63.     Also in November 2015, Defendant Antonacci petitioned the Onondaga County

Legislature ("County Legislature") to revoke the CRC contract because the County Executive's

offices did not select the bidder who submitted the highest bid, which Defendant Antonacci

contended would have generated the most revenue for the County.  In this bidding scenario the

County was not the entity paying but was the entity being paid. Thus, the highest responsible bid

in this bidding scenario is similar to the lowest responsible bid when the County is paying, rather

than being paid.  Because Syracuse Parking Services had bid $16,500, the Defendant Antonacci

contested the awarding of the contract to CRC, and instead argued that Syracuse Parking

Services should have been awarded the contract and that their bid should not have been

disqualified.

64.     However, according Defendant Antonacci's audit the estimated gross revenue of

the three lots is approximately $17,558.00 including special events.  Antonacci's argument that

the County was losing $8,500 per month fails to address the realistic costs of running the parking

lots.  Upon reviewing those facts and the profit and loss statements of Mr. Talbert, the County

Legislature refused to revoke CRC's contract and confirmed that Syracuse Parking Services' bid

was rightly disqualified, not only because of the irresponsible bid of $16,500 per month, but also

based upon the irrefutable personal and professional connection of Mr. Gross to Murbro.  At the time of failure to pay the County money owed under the parking lot contracts, Murbro was owned by Mr. Gross's in-laws. Mr. Gross was not only the General Manager of Murbro but also married to the daughter of Murbro owners. Mr. Gross's wife is also a co-president of Syracuse Parking Services. But that close relationship did not prevent Defendant Antonacci brazenly issuing a press statement saying, "[Gross] has no connection to Murbro.  A sampling of the legislature's response to the Comptroller's actions is reflective in a June 17, 2016 media report published by CNY Vision, an African-American based Syracuse media outlet. CNY vision stated that "Onondaga County Legislator Linda Ervin stated that she believes Antonacci has overstepped his authority:"

> *Antonacci came to us a year ago [about CRC] and the legislature didn't agree with him... I don't know but it has been an unprecedented hands-on questioning and approach, to discredit and revoke the contract the county has with Cheyenne Realty. I feel badly, because I worked with legislator Monica Williams to push to have more minority contractors bid on county contracts. I feel these types of actions by the comptroller will deter them.*

65.     Besides lobbying the County Legislature, the Comptroller also utilized the media to humiliate CRC and Mr. Talbert in order to garner support and have the contract rescinded. Defendant Antonacci did this by successfully publishing his press release verbatim in numerous media outlets which opened with "Onondaga County Comptroller Robert E. Antonacci released his report criticizing the awarding of a contract to Cheyenne Realty Corp..."  Defendant Antonacci advocated that the County was losing revenue, but did not acknowledge that not only was the Syracuse Parking Services bid irresponsible, but impracticable and would have resulted in the same fate as Murbro, a contractor failing to pay because their revenue cannot meet the expenses.

25

66.     Not finished with his custom practice and policy of intimidating, oppressing, harassing and publicly degrading minority contractors Defendant Antonacci devised another way to scrutinize Mr. Talbert. Shortly after the Comptroller's efforts to smear CRC and Mr. Talbert in the media, an unidentified man showed up unannounced to parking lot *B* wearing a jacket that distinctly showed the brightly printed word "auditor" and began flashing his badge, just as occurred to Mr. Smith at the War Memorial. The man told the lone CRC employed parking attendant that he was sent there by the County Comptroller and he was told he had to count the cars in all three parking lots. Fearing the badge flashing individual, the CRC employee did not hesitate to provide him access that he demanded.

67.     Under CRC's contract with the County, it unambiguously states:

> [t]he County shall have the right to inspect the parking lots at any and all times to assure the proper performance of this contract. Also, the County shall have free access, *upon reasonable notice*, during the hours of business to audit the lessee's books, records and accounts in connection with said operations.

*Parking Lot Management Services RFP § 7.6.3*

68.     Even if Defendant Antonacci, rather than the administering County agency, was provided the right to audit via this provision, Defendant Antonacci had no authorization whatsoever to aggressively just show up and intimidate a parking lot attendant without prior reasonable notice to the business owner.  This unannounced visit exceeded Defendant Antonacci's authority and was engineered to harass and intimidate another African-American male business owner doing business with the County.

69.     Shortly after this unannounced and intimidating visit, Defendant Antonacci demanded from Mr. Talbert financial reports for all of the parking lots, including daily parkers, monthly pass holders, and special events. In response to this request, Mr. Talbert contacted Facilities regarding the necessity to produce the financial information to the Comptroller.

26

789627

Facilities advised Mr. Talbert that according to Parking Lot Management Services RFP §7.64, he was only required to provide quarterly information regarding special event parking to the Comptroller:

> [t]he lessee shall maintain a record of the operation of the parking lots and supply a quarterly report which shall contain a list of those with monthly parking permits. In addition, the lessee shall provide a quarterly report listing all event parking during that time, indicating the name of the event, the date and the revenue taken in.

70.     Later in 2015, the one Trolley lot (Lot C) came up for bid. Mr. Talbert made a bid and began negotiations with the County. Ultimately, the County and CRC could not reach an agreement. The Trolley Lot went back up for bid again, but at that point Mr. Talbert chose not re-bid. Mr. Talbert's decision not to re-bid for the Trolley Lot was a direct result of the public, private, and professional degradation and harassment he received from Defendant Antonacci. The chilling effect on minority owned businesses from bidding on County projects was working.

71.     After his experience, Mr. Talbert filed a complaint with the local NAACP, the County Executive, the County Legislature, and his local legislator. Because of these practices, and the blatant hostility publicly expressed towards him by Defendant Antonacci, Mr. Talbert has been permanently scarred by the overt acts of discrimination.

72.     The use of the segregated payment systems, the withholding of pre-approved payments, the brazen menacing of employees, and the general harassing and intimidating acts of the Comptroller indicate a pattern of abuses by a County policymaker against the minority owned businesses and other members of the Onondaga County community.  As a result, within less than two years, Defendant Antonacci has created a hostile environment for present and future minority-business owners and has already started to chill minority business owners from contracting with Onondaga County.  These acts must be stopped and the antagonistic environment of the County needs to be remedied.

789627

### FIRST CAUSE OF ACTION
#### (Against Defendant Antonacci)
#### Violation of the Civil Rights Act of 1871 – 42 U.S.C. § 1983
#### As to the Fourteenth Amendment of the U.S. Constitution

73.     Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

74.     At all relevant times herein, Defendant Antonacci through his actions and instructions directly caused and continues to cause the violation of the Plaintiffs' Constitutional rights granted under the 14th Amendment of the United States Constitution and its guarantee of equal protection under the laws for all citizens.

75.     Defendant Antonacci's actions were and are conducted under the color of state law and pursuant to his position as County Comptroller of Onondaga County, New York.  These actions include, but are not limited to, creating a hostile environment for minority owned businesses in Onondaga County through the targeted and improper use of audits; the withholding, delay, and differential treatment of County payments to minority owned businesses; and other disparate treatment towards minority owned businesses.

76.     Defendant Antonacci's discriminatory actions were and are against clearly established federal and state law and are objectively unlawful.  These actions were deliberately designed to disadvantage, harass, and intimidate minority-owned businesses and deter them from pursuing contracts with Onondaga County and deny them equal protection of the law.

77.     Plaintiffs seek relief from Defendant Antonacci's active infringement of their rights guaranteed by the 14th Amendment pursuant to 42 U.S.C. § 1983.  Defendant Antonacci's actions are the legal cause of injuries to Plaintiffs as alleged herein; and as a result thereof, Plaintiffs have sustained general and special damages, as well as incurring attorneys' fees, costs

789627

and expenses, including those as authorized by 42 U.S.C. § 1988, to an extent and in an amount subject to proof at trial.

78.     If Defendant Antonacci's unlawful actions are not enjoined, Plaintiffs and members of the minority-business community of Onondaga County[5] will suffer irreparable injury for which there is no adequate remedy at law in that they will continue to be deprived of their rights under 42 U.S.C. § 1983 and the United States Constitution.

**SECOND CAUSE OF ACTION**
**(Against Defendant County of Onondaga)**
**Violation of the Civil Rights Act of 1871 – 42 U.S.C. § 1983**
**As to the Fourteenth Amendment of the U.S. Constitution**

79.     Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

80.     At all relevant times herein, Defendant County of Onondaga through the actions of Defendant Antonacci caused and continues to cause the violation of the Plaintiffs' Constitutional rights granted under the 14th Amendment of the United States Constitution and its guarantee of equal protection under the laws for all citizens.

81.     Defendant County of Onondaga through the actions of Defendant Antonacci maintained a policy and practice of discrimination against minority owned business by and pursuant to the acts of Defendant Antonacci, a policymaker of the County.

82.     Defendant Antonacci's actions were and are conducted under the color of state law pursuant to his position as County Comptroller of Onondaga County, New York and by virtue of his position as an elected official and policymaker for the County of Onondaga,

---

[5] The Plaintiffs seek injunctive relief against the Comptroller's discriminatory policies for the collective group of 1) all MBE's and DBE's that are presently serving as prime contractors and subcontractors to the County of Onondaga and 2) all MBE's and DBE's that are registered with the County of Onondaga's Division of Purchase in anticipation of seeking future business opportunities with the County.

789627

established a county policy that intentionally and actually violated and continues to violate the constitutional rights of the Plaintiffs and the members of minority-business community of Onondaga County.  These actions include, but are not limited to, creating a hostile environment for minority owned businesses in Onondaga County through the targeted and improper use of audits; the withholding, delay, and differential treatment of County payments to minority owned businesses; and other disparate treatment towards minority owned businesses.

83.    Defendant Antonacci maintained and continues to maintain final policymaking authority for the above actions.

84.    Plaintiffs seek relief from Defendant County of Onondaga's policy and practice of active infringement of their rights as guaranteed by the 14th Amendment pursuant to 42 U.S.C. § 1983, as well as the case of *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).  Defendant Antonacci's, and therefore the Defendant County of Onondaga's, actions are the legal cause of injuries to Plaintiffs herein; and as a result thereof, Plaintiffs have sustained general and special damages, as well as incurring attorneys' fees, costs and expenses, including those as authorized by 42 U.S.C. § 1988, to an extent and in an amount subject to proof at trial.

85.    If Defendant County of Onondaga's and Defendant Antonacci's unlawful actions are not enjoined, Plaintiffs and the minority owned business in Onondaga County will suffer irreparable injury for which there is no adequate remedy at law in that they will continue to be deprived of their rights under 42 U.S.C. § 1983 and the United States Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants as follows:

789627

a.      Awarding general damages in an amount to be determined by proof at

trial;

b.      Entering an order enjoining the Defendants from continuing the improper

use of audits; the withholding, delay, and differential treatment of County

payments to minority owned businesses; and other disparate treatment

towards minority owned businesses from non-minority owned businesses;

c.      Awarding attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

d.      Awarding pre-judgment and post-judgment interest at the legal rate; and

e.      Providing such further relief as may be just and proper.

Dated: Albany, New York                         **DEVAPRASAD PLLC**
      October 6, 2016


      /s/ S. David Devaprasad_____
      S. David Devaprasad
      Devaprasad PLLC
      119 Washington Avenue
      Albany, NY 12210
      Email: sdd@devalaw.com
      Tel: (518) 496-9238

      *Local Counsel*


      **WOLF HALDENSTEIN ADLER**
      **FREEMAN & HERZ LLP**

      Malcolm Brown
      270 Madison Ave.
      New York, NY 10016
      Brown@whafh.com
      Tel.:    (212) 545-4600
      Fax:    (212) 686-0114

      *Counsel for Dino Dixie, Eli Smith and*
      *Cheyenne Talbert*

789627