UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DINO DIXIE, ELI SMITH, and CHEYENNE
TALBERT,

                    Plaintiffs,

          v.                                        5:16-CV-1221
                                                      (FJS/TWD)
ROBERT E. ANTONACCI, III, and
THE COUNTY OF ONONDAGA,

                    Defendants.
_____

APPEARANCES                          OF COUNSEL

WOLF, HALDENSTEIN, ADLER,            GREGORY M. NESPOLE, ESQ.
FREEMAN & HERZ LLP                   KEVIN COOPER, ESQ
270 Madison Avenue                   MALCOLM T. BROWN, ESQ.
New York, New York 10016
Attorneys for Plaintiffs


DEVAPRASAD PLLC                      S. DAVID DEVAPRASAD, ESQ
119 Washington Avenue
Albany, New York 12210
Attorneys for Plaintiffs


SUGARMAN LAW FIRM LLP                PAUL V. MULLIN, ESQ.
211 West Jefferson Street
Syracuse, New York 13202
Attorneys for Defendant Antonacci

**ONONDAGA COUNTY**
**DEPARTMENT OF LAW**
John H. Mulroy Civic Center
421 Montgomery Street, 10th Floor
Syracuse, New York 13202
Attorneys for Defendant County
of Onondaga

**JOHN E. HEISLER, JR., ESQ.**
**KATHLEEN M. DOUGHERTY, ESQ.**

**SCULLIN, Senior Judge**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Pending before the Court are Defendant Antonacci's and Defendant County of Onondaga's motions to dismiss Plaintiffs' complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* Dkt. Nos. 11, 12.

### II. BACKGROUND

**A.    General information**

Plaintiff Dixie owns and operates 1st Point LLC ("1st Point"), a full service construction management company. *See* Dkt. No. 1 at ¶ 7. Plaintiff Smith owns and operates So Gone Trash Removal LLC ("SGTR") and E. Smith Contractors LLC ("E. Smith") (collectively the "Smith Companies"). *See id.* at ¶ 8. Plaintiff Talbert owns and operates Cheyenne Realty Corp. ("CRC"). *See id.* at ¶ 9. Defendant Antonacci has been the elected Comptroller for Defendant Onondaga County ("Defendant County") since January 2008. *See id.* at ¶¶ 10, 12.

When Defendant County "requires the provision of goods and/or services, it can turn to the County's external workforce, i.e., those in the Onondaga County community outside of County Government services." *See id.* at ¶ 25. "Through its procurement process the County

can award contracts in two ways: 1) it can award a contract to a vendor if the contract is below a certain threshold or 2) develop a request for proposal ("RFP") that lists the scope of work the County is seeking and the bidding requirements." *See id*.

According to Plaintiffs, the current County Executive of Defendant County "has put in place a program to encourage minority-owned businesses to bid for County work both to increase such participation and to encourage minority-owned businesses in Onondaga County." *See id*. at ¶ 13. However, Plaintiffs contend that Defendant Antonacci, as Comptroller, has contradicted the County Executive's program and, instead, has instituted his own policy aimed at "continu[ing] the historic discrimination in government contracting." *See id*. at ¶ 14.

Plaintiffs allege that Defendant Antonacci's policy discourages minority-owned business enterprises ("MBEs") from serving as vendors to Defendant County and protects and favors non-MBE vendors. *See id* at ¶ 15. Thus, Plaintiffs assert that Defendant Antonacci's illicit policy has caused Defendant County to discriminate against MBEs in violation of the law. *See id*. Specifically, Plaintiffs allege that Defendant Antonacci has "targeted minority businesses by creating a custom and practice of intimidation and harassment through oppressive tactics." *See id*. at ¶ 16. Plaintiffs contend that Defendant Antonacci has treated similarly situated non-MBEs differently and has participated in

> public and private degradation, humiliation, and personal intimidation of the minority-owned contractor's principals and their employees, as well as the purposeful delay of payments through either unnecessarily dissecting aspects of minority-owned contractor deliverables even after the work has been approved by the County and segregating out payments to minority-owned contractors, which have resulted in financial damage.

*See id.*

**B.      Specific allegations with respect to each Plaintiff**

*1. Plaintiff Dixie*

Plaintiff Dixie's business, 1st Point, received contracts for various projects through the Construction Management RFP program,[1] including working on the Onondaga County Library, Everson Parking Garage, Van Dyne Hospital, Upstate Hospital, and the Village of Solvay. *See* Dkt. No. 1 at ¶ 28. As a contractor in the Construction Management RFP, Plaintiff Dixie was instructed to report directly to the County Facilities Department. *See id.* However, in early 2015, Plaintiff Dixie learned that the Onondaga County Comptroller, Defendant Antonacci, had a file on his desktop labeled "Dino Dixie." *See id.* at ¶ 29. Plaintiff Dixie discovered, through an unrelated Freedom of Information Law ("FOIL") request, that Defendant Antonacci was monitoring his payments. *See id.* According to Plaintiffs, shortly after receiving the FOIL request, Defendant Antonacci "announced via press release that he would respond to FOIL requests within forty-eight hours and that he would post the FOIL requests and his responses to them for public viewing on his website." *See id.* at ¶ 31. The timing of the announcement and the sudden change in his policy gave Plaintiff Dixie "the alarming impression that the FOIL request was . . . prompted . . . by Defendant Antonacci in order to develop a County custom of intimidating minority businesses through his powers as a County policymaker" by making Plaintiff Dixie's financial information publicly available. *See id.* at ¶ 32.

---

[1] The Onondaga County Department of Facilities ("Facilities") issued the Construction Management RFP in an effort to select a panel of contractors with varying skill sets to be available to provide services on future projects. In 2013, seven responsible bidders, including 1st Point, were selected to be on the panel of contractors. 1st Point was the only minority-owned business on the panel. After the panel was selected and when projects became available, Facilities either assigned projects to a panelist or issued a mini-bid to the panelists to compete against each other, and the lowest bidder would most often prevail and be selected to work on the designated mini-bid project. *See* Dkt. No. 1 at ¶ 28.

Moreover, before February 12, 2016, every payment from Defendant County to Plaintiff Dixie was sent in a so-called "All-In-One" check where the check was mailed without an additional envelope and with metered postage. However, beginning February 12, 2016, and until the filing of this lawsuit, every payment that Plaintiff Dixie has received for work related to County contracts has come in an official envelope from Defendant Antonacci's office with a computer printed label and a United States Flag stamp. *See id*. at ¶ 38. According to Plaintiffs, "the absence from the All-In-One Checks of the Metered Postage Mark meant that the Defendant Antonacci never forwarded it to the County operated mailroom [but, i]nstead, purposely held back each of [Plaintiff] Dixie's payments, so that he or his employees could personally mail out the checks in line with his intimidating New Custom." *See id.* at ¶ 39.

### 2. Plaintiff Smith

Defendant County awarded Plaintiff Smith's companies three contracts to be completed between late 2015 and early 2016. *See id.* at ¶ 42. Defendant Antonacci refused to make payments to Plaintiff Smith ostensibly for procedural errors with respect to two of those projects. First, Defendant Antonacci refused to pay invoices related to the Hutchings project because Plaintiff Smith had not yet installed a door, although the contract allegedly allowed for payment prior to the door's installation. *See id.* at ¶¶ 44, 47. Second, Plaintiff Smith was informed that Defendant Antonacci refused to pay invoices related to the Civic Center project because those invoices were not on company letterhead. *See id*. at ¶ 47. After Plaintiff Smith corrected these issues, he alleges that Defendant Antonacci purposely delayed processing the payment even further, causing financial and emotional distress. *See id*. at ¶ 50. In short, Plaintiff Smith

contends that Defendant Antonacci exceeded his authority in controlling how Plaintiff Smith was paid.

Furthermore, Plaintiff Smith allegedly received payments for his contractual work on the War Memorial Arena in a similar fashion as Plaintiff Dixie, *i.e.*, All-In-One checks that were placed in an envelope with a stamp.[2]  *See id*. at ¶ 54.  Moreover, Plaintiffs assert that Defendant Antonacci personally showed up at the War Memorial job wearing a "County Comptroller jacket" and asked a junior painter questions about who each of the workers were at the site.  *See id*. at ¶ 55.  According to Plaintiffs, Defendant Antonacci's conduct exceeded his authority as Comptroller and was harassment.  *See id*.

In March 2016, Plaintiff Smith emailed Defendant Antonacci to inquire about late payments and how to improve their relationship.  *See id*. at ¶ 56.  The two met in person and Defendant Antonacci allegedly explained that he had received complaints of fraud for the work Plaintiff Smith was completing at the War Memorial.  *See id.* at ¶ 57.  Thereafter, in April 2016, Plaintiff Smith decided that he would no longer bid for County projects.  *See id.* at ¶ 58.

### 3. Plaintiff Talbert

Defendant County selected Plaintiff Talbert to manage three County parking lots.  *See id*. at ¶ 61.  A few months after Defendant County awarded Plaintiff Talbert the contracts, Defendant Antonacci conducted an audit of his company.  *See id.* at ¶ 62.  According to Plaintiffs, "[o]f the over fifty audits published on the Comptroller's website from January 1, 2014 to present the audit of CRC appears to be the only one against a vendor of the County."  *See id*.

---

[2] There was one exception -- one check was mailed in the normal fashion, although with a US Stamp, rather than a metered postage marker.  *See* Dkt. No. 1 at ¶ 54.

Furthermore, Plaintiffs assert that Defendant Antonacci attempted to lobby the Onondaga County Legislature to revoke CRC's contract because there was a competing bid that would have paid Defendant County $8,500 more. *See id.* at ¶¶ 63. However, Plaintiffs contend that the competing bid was from a vendor who had previously defaulted on its responsibility to Defendant County; and, further, the competing bid was unrealistic when considering the actual revenue to be expected from managing the parking lots. *See id.* at ¶¶ 61-64. Defendant Antonacci's tactics, according to Plaintiffs, were meant to humiliate Plaintiff Talbert by publishing press releases degrading his company without acknowledging that the competing offer was impracticable. *See id.* at ¶ 65.

Moreover, Plaintiffs allege that Defendant Antonacci sent an individual from the County Comptroller's office to count the cars in all three of the parking lots that Plaintiff Talbert managed. *See id.* at ¶ 66. However, this inspection was unannounced, and the contract with Defendant County unambiguously requires "reasonable notice" to audit CRC's "books, records and accounts in connection with said operations." *See id.* at ¶ 67. According to Plaintiffs, "[t]his unannounced visit exceeded Defendant Antonacci's authority and was engineered to harass and intimidate another African-American male business owner doing business with the County." *See id.* at ¶ 68. Finally, Plaintiffs allege that Defendant Antonacci's actions led Plaintiff Talbert to refuse to bid on another parking lot project. *See id.* at ¶ 70.

**C.     Plaintiffs' claims**

Based on the above-cited allegations, Plaintiffs bring two causes of action. First, pursuant to 42 U.S.C. § 1983, Plaintiffs allege that "Defendant Antonacci through his actions and instructions directly caused and continues to cause the violation of the Plaintiffs' Constitutional

rights granted under the 14th Amendment of the United States Constitution and its guarantee of equal protection under the laws for all citizens." *See* Dkt. No. 1 at ¶ 74. "These actions include, but are not limited to, creating a hostile environment for minority owned businesses in Onondaga County through the targeted and improper use of audits; the withholding, delay, and differential treatment of County payments to minority owned businesses; and other disparate treatment towards minority owned businesses." *See id.* at ¶ 75. "These actions were deliberately designed to disadvantage, harass, and intimidate minority-owned businesses and deter them from pursuing contracts with Onondaga County and deny them equal protection of the law." *See id*. at ¶ 76. Plaintiffs seek damages as well as an injunction. *See id*. at ¶¶ 77, 78.

Second, pursuant to 42 U.S.C. § 1983, Plaintiffs allege that Defendant County "through the actions of Defendant Antonacci caused and continues to cause the violation of the Plaintiffs' Constitutional rights guaranteed under the 14th Amendment of the United States Constitution and its guarantee of equal protection under the laws for all citizens." *See id.* at ¶ 80. Specifically, "Defendant County of Onondaga through the actions of Defendant Antonacci maintained a policy and practice of discrimination against minority owned business[es] by and pursuant to the acts of Defendant Antonacci, a policymaker of the County." *See id.* at ¶ 81. "These actions include, but are not limited to, creating a hostile environment for minority owned businesses in Onondaga County through the targeted and improper use of audits; the withholding, delay, and differential treatment of County payments to minority owned businesses; and other disparate treatment towards minority owned businesses." *See id.* at ¶ 82.

# III. DISCUSSION

## A.    Standard of review

Courts use a two-step inquiry when addressing a Rule 12(b)(6) motion.  First, "they isolate the moving party's legal conclusions from its factual allegations."  *Hyman v. Cornell Univ.*, 834 F. Supp. 2d 77, 81 (N.D.N.Y. 2011).  Second, courts must accept factual allegations as true and "determine whether they plausibly give rise to an entitlement to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  A pleading must contain more than a "blanket assertion[ ] of entitlement to relief."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n.3 (2007).  Thus, to withstand a motion to dismiss, a pleading must be "plausible on its face" such that it contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citation omitted).

Furthermore, when addressing a Rule 12(b)(6) motion, a court may "consider documents attached to or incorporated by reference in [a] complaint[.]"  *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir.1998) (citation omitted).  Even where "'a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint,' the court may . . . take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment."  *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (quotation omitted).

In this case, the Court has considered Plaintiff's complaint as well as the two exhibits annexed to the complaint, which include scanned copies of the envelopes that Defendant Antonacci sent to Plaintiff Dixie.  *See* Dkt. Nos. 1-1, 1-2.

**B.      Defendant Onondaga County's motion to dismiss**

Defendant County argues that "Plaintiffs fail to allege that the Defendant County somehow acted in a way to deprive Plaintiffs of their rights.  To the contrary, as Plaintiffs state, the County's official policy was to enhance Plaintiffs' and other minority-businesses' ability to bid on and perform government contracts.  *See* Dkt. No. 12-2 at 7.  Although Plaintiffs allege that Defendant Antonacci "engaged in intimidation, harassment, establishment of separate payment arrangements, delayed payments, and improper use of audits against the Plaintiffs based on their status as minority-owned businesses[,]" Defendant County asserts that "Plaintiffs fail to allege facts plausibly suggesting that [Defendant Antonacci] was acting in accordance with County policy."  *See id*.  Thus, Defendant County avers that, "[t]he injuries and damages alleged by Plaintiffs . . . were not the result of the County's official policy but as a result of the contravention of the policy by [Defendant Antonacci]."  *See id*. at 8.

In a suit under 42 U.S.C. § 1983, a county may be held liable

if the conduct that caused the unconstitutional deprivation was undertaken pursuant to

> "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers[,] . . . [or] pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels."

*Jeffes v. Barnes*, 208 F.3d 49, 56–57 (2d Cir. 2000) (quoting [*Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658,] 690-91, 98 S. Ct. 2018 [(1978)]).  In other words, a county may be liable where the "'injury was inflicted by [its] "lawmakers or by those whose edicts or acts may fairly be said to represent official policy."'"  *Id*. (quoting *St. Louis v. Praprotnik*, 485 U.S. 112, 121-22, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988) (plurality opinion) (quoting *Monell*, 436 U.S. at 694, 98 S. Ct. 2018)).

- 10 -

In this case, Plaintiffs have alleged that constitutional violations occurred as a result of policies that Defendant Antonacci, as County Comptroller, created. Thus, "the court must determine whether [Defendant Antonacci] had final policymaking authority in the particular area involved." *Id*. (citations omitted). "Whether the official in question possessed final policymaking authority is a legal question, . . ., which is to be answered on the basis of state law, …" *Id*. (internal citations omitted). In making this determination, the court should consult "'state and local positive law, as well as custom or usage having the force of law.'" *Id*. (quotation omitted). Furthermore, the county official "need not be a municipal policymaker for all purposes" but must only be responsible for making policy in the particular area that is involved in this action. *Id.*

Here, Plaintiffs contend that Defendant Antonacci violated their constitutional right to equal protection under the law by implementing intimidating billing and auditing practices that singled out MBEs on account of the race of their owners. Thus, the question in this case, is whether Defendant Antonacci had final policymaking authority with respect to billing and auditing duties. A fair review of the applicable laws clearly answers this question in the affirmative.

Plaintiffs point first to the County Charter, which states, in pertinent part, "'The comptroller shall . . . [be] the chief accounting and auditing officer of the county [and] [a]udit and certify for payment all lawful claims or charges against the county or against funds for which the county is responsible.'" *See* Dkt. No. 11-4, Ex "C," Onondaga County Charter, Article V, Section 502. Similarly, the Administrative Code states, "The Comptroller shall be the chief accounting and auditing officer of the County." Among the duties for the Comptroller, the Administrative Code lists:

(b) certify the availability of funds for all requisitions, contracts, purchases orders and other documents by which the County shall incur financial obligations or for the expenditure of funds for which the County shall be responsible;

(c) prescribe the form of receipts, vouchers, bills and claims, unless otherwise required by the State Comptroller;

(d) audit and certify for payment all lawful claims or charges against the County, whether for payroll or otherwise, or against funds for which the County shall be responsible in whole or in part; . . .

*See* Dkt. No. 11-5, Ex. "D," Administrative Code, Section 5.02(b)-(d).

Further, New York County Law affirms that a county comptroller has "general superintendence over the fiscal affairs of the county . . . ." N.Y. County Law § 577(1)(a).[3] In sum, New York law confirms that Defendant Antonacci, as the Onondaga County Comptroller, had final policy making authority over the very activities that Plaintiffs allege deprived them of their constitutional rights.

Nonetheless, Defendant County argues that it cannot be held liable for Defendant Antonacci's actions because its official policy was to encourage MBEs. *See* Dkt. No. 12-2 at 4. Therefore, Defendant County contends that the Court should dismiss Plaintiffs' claim against it because the alleged constitutional violations relate to actions which ran contrary to county policy. Defendant Onondaga County's argument, however, ignores the legal principle that, when "'an official has final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy.'" *Clue v. Johnson*, 179 F.3d 57, 62 (2d Cir. 1999) (quoting *Rookard v. Health & Hosps. Corp.*, 710 F.2d 41, 45 (2d Cir. 1983)). In that vein, "'municipal liability may be imposed for a single decision by municipal policymakers.'" *Nagle v.*

---

[3] The Court takes judicial notice of local laws that are part of the public record. *See Missere v. Gross*, 826 F. Supp. 2d 542, 553 (S.D.N.Y. 2011).

*Marron*, 663 F.3d 100, 116 (2d Cir. 2011) (quotation omitted). Thus, although Defendant Antonacci allegedly contradicted County policy, Defendant County could still be liable because his actions, made in the scope of his authority as County Comptroller, are imposed on the County. *See id.*

In sum, the Court finds that Plaintiffs have stated a plausible claim against Defendant County for municipal liability related to the actions of Defendant Antonacci. Therefore, the Court denies Defendant County's motion to dismiss.

## C.     Defendant Antonacci's motion to dismiss

In support of his motion, Defendant Antonacci makes the following five arguments: (1) Plaintiffs lack standing to bring this action; (2) Plaintiffs' claims should be dismissed insofar as they name Defendant Antonacci in his official capacity; (3) Plaintiffs fail plausibly to allege a Fourteenth Amendment violation; (4) qualified immunity protects Defendant Antonacci; and (5) Plaintiffs are not entitled to punitive damages.

### *1. Plaintiffs' standing*

To establish standing under Article III of the Constitution, a plaintiff must demonstrate the following: (1) an "injury in fact," (2) "'a causal connection between the injury and the conduct complained of,'" and (3) a "'"substantial likelihood" that the requested relief will remedy the alleged injury in fact.' . . ."  *McConnell v. FEC*, 540 U.S. 93, 225 (2003), *overruled on other grounds by Citizens United v. Fed. Elec. Comm'n*, 558 U.S. 310 (2010) (internal quotation and citations omitted). In the context of the Equal Protection Clause, an injury occurs

> [w]hen the government erects a barrier that makes it more difficult for members
> of one group to obtain a benefit than it is for members of another group, a
> member of the former group seeking to challenge the barrier need not allege that

> he [or she] would have obtained the benefit but for the barrier in order to establish standing.

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993).

In that regard, "[t]he 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Id*. (citation omitted). Thus, as the Second Circuit explained in *Comer v. Cisneros*, 37 F.3d 775 (2d Cir. 1994), "to show Article III standing for constitutionally-protected equal protection claims, a plaintiff must allege that (1) there exists a reasonable likelihood that the plaintiff is in the disadvantaged group, (2) there exists a government-erected barrier, and (3) the barrier causes members of one group to be treated differently from members of the other group." *Id.* at 793 (citations omitted).

Defendant Antonacci substantively argues that Plaintiffs have failed to allege a sufficient injury because the only resulting impact of his allegedly unconstitutional acts is that Plaintiff Smith stopped bidding on projects with the County and Plaintiff Talbert chose not to re-bid on a parking project. The Court disagrees.

In *Comer*, the Second Circuit held that a plaintiff had standing to bring an equal protection claim where she alleged that the defendant's Section 8 housing subsidy program "rules and regulations, *in their administration*, violate the Constitution because they erect a barrier that makes it more difficult for economically disadvantaged blacks to obtain a housing benefit than it is for non-minorities." *Id*. at 791 (citation omitted). The unconstitutional barrier, therefore, was how the administration executed its program. *See id*. *Comer* also addressed the plaintiffs' challenge to a local preference program for housing subsidies and held that "[t]he injury is not the failure to obtain housing assistance in the suburbs, but is the missed opportunity to compete

for suburban housing on an equal footing with the local residents." *Id*. at 794; *see also Thomas v. City of N.Y.*, 143 F.3d 31, 36 (2d Cir. 1998) (finding standing where the plaintiffs' "equal protection claim challenge[d] the imposition of allegedly discriminatory and burdensome requirements (such as off-street parking") (footnote omitted)).

In this case, Plaintiffs, as individuals, have plausibly alleged sufficient barriers that have caused them to be treated differently because of their race. Plaintiffs Dixie and Smith allege, among other things, that Defendant Antonacci subjected them to a different payment procedure meant to intimidate minorities. Furthermore, Plaintiff Talbert alleges that Defendant Antonacci used his authority as Comptroller to try and persuade the County Legislature to revoke his contract and further instituted audits of his company in a discriminatory manner. As stated above, "[t]he 'injury in fact' . . . is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability" to continue contracting with the County. *Jacksonville,* 508 U.S. at 666.

Furthermore, the barriers that Plaintiffs allege are causally related to Defendant Antonacci's actions; and, an injunction, one of the remedies that Plaintiffs seek, would likely eliminate these barriers. Therefore, the Court finds that Plaintiffs have adequately shown that they have standing to pursue their Equal Protection claims.

### 2. Plaintiffs' claims against Defendant Antonacci in his official capacity

Defendant Antonacci contends that Plaintiffs have only named him in his official capacity. *See* Dkt. No. 11-6 at 13. Further, Defendant Antonacci argues that "[a]n action brought pursuant to 42 U.S.C. § 1983 'against an official in his official capacity is not a suit against the official personally, for the real party in interest is the entity.'" *See id.* (quoting *Lore v.*

*City of Syracuse*, 670 F.3d 127, 168 (2d Cir. 2012)). Moreover, Defendant Antonacci asserts that "'a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself.'" *See id.* (quoting *Lore*, 670 F.3d at 168). Therefore, according to Defendant Antonacci, "[w]hen a plaintiff names both a municipality and an official in his or her official capacity as defendants, the official capacity claim should be dismissed as duplicative of the claim against the municipality." *See id.* (citing *Gazzola v. Cty. of Nassau*, No. 16-CV-0909, 2016 WL 6068138, *4 (E.D.N.Y. Oct. 13, 2016)). Thus, Defendant Antonacci argues that the claims against him are duplicative and that, therefore, the Court should dismiss him from this suit. *See id.* at 14.

Plaintiffs do not dispute that their claims against Defendant Antonacci in his official capacity are duplicative of their claims against Defendant County. However, a fair reading of their complaint makes clear that Plaintiffs are also asserting their claims against Defendant Antonacci in his individual capacity. Furthermore, Defendant Antonacci appears to recognize that this is so because, otherwise, there would be no basis for him to assert that he is entitled to qualified immunity.

"'Within the Second Circuit, where a plaintiff names both the municipal entity and an official in his or her official capacity, district courts have consistently dismissed the official capacity claims as redundant.'" *Gazzola v. City of Nassau*, No. 16-cv-0909, 2016 WL 6068138, *4 (E.D.N.Y. Oct. 13, 2016) (quoting *Phillips v. Cty. of Orange*, 894 F. Supp. 2d 345, 384 n.35 (S.D.N.Y. 2012)) (other citations omitted). In light of the relevant case law, the Court grants Defendant Antonacci's motion to dismiss Plaintiffs' claims against him insofar as Plaintiffs assert those claims against him in his official capacity as duplicative of their claims against Defendant County.

### 3. Plaintiffs' Fourteenth Amendment equal protection claims

#### a. The parties' positions

Defendant Antonacci states that "[t]he exact nature of plaintiffs' Fourteenth Amendment claim against him is unclear." *See* Dkt. No. 11-6 at 17. In his initial memorandum, Defendant Antonacci argues that whether Plaintiffs allege intentional discrimination, disparate treatment, selective enforcement, or hostile work environment claims -- they all fail. *See id.* In their response, Plaintiffs only address intentional discrimination. *See* Dkt. No. 17 at 15. In that sense, the crux of the parties' disagreement is whether the facts in Plaintiffs' complaint plausibly allege that Defendant Antonacci acted with discriminatory intent.

Defendant Antonacci argues that Plaintiffs have not "pled a single factual allegation that connects any of his alleged actions to race or to their companies' alleged status as minority-owned businesses." *See* Dkt. No. 11-6 at 17. Instead, according to Defendant Antonacci, Plaintiffs

> simply allege that [he] engaged in conduct that was within his powers and duties as Comptroller, describe their subjective dissatisfaction with his alleged execution of those powers and duties (along with their apparent dissatisfaction with the public nature of County contracting and the accountability a County contractor has to taxpayers), and then speculate that [his] alleged actions were based upon some unsubstantiated discriminatory animus.

*See id.* Thus, Defendant Antonacci argues that, because there are no plausible allegations of intentional discrimination, the Court should dismiss Plaintiffs' equal protection claims. *See id.*

Plaintiffs agree that "'[d]iscriminatory purpose . . . implies that the decisionmaker … selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.'" *See* Dkt. No. 17 at 16 (quoting *Hayden*

*v. Paterson*, 594 F.3d 150, 163 (2d Cir. 2010) (internal quotation omitted)). "'However, while a plaintiff must prove that there was a discriminatory purpose behind the course of action, a plaintiff need not prove that the 'challenged action rested solely on racially discriminatory purposes.'" *See id.* (quoting *Hayden*, 594 F.3d at 163).

> Plaintiffs assert that Defendant Antonacci's
>
> invidious and abusive application of his authority against Plaintiffs, when taken as a whole, illustrates a course of conduct that was selected to injure and harass minority contractors. [Defendant] Antonacci wielded his authority to disburse checks and delay payment in a manner to harass and hamper the activities of [Plaintiffs] Dixie and [] Smith, contractors paid by the County for services. Since [Plaintiff] Talbert pays the County pursuant to his contract and does not receive a check from the County, the only method of harassment within [Defendant] Antonacci's authority was to audit [Plaintiff] Talbert, which he did without justification while lobbying against CRC's holding of the parking lot contract.

*See id.*

Furthermore, Plaintiffs contend that Defendant Antonacci "explicitly lobbied the County Legislature against [Plaintiff] Talbert in favor of a non-minority contractor, who was directly affiliated with the prior vendor that failed to pay the County almost $200,000 and was subject to a judgment." *See id.*

### b. Analysis

The Court must first consider what allegations in Plaintiffs' complaint it must accept as true for the purpose of this motion. *See Hayden v. Paterson*, 594 F.3d 150, 162 (2d Cir. 2010) (setting aside conclusory allegations made in an intentional discrimination claim (footnote omitted)). After isolating these facts, the Court will next consider whether Plaintiffs have plausibly alleged a viable claim.

### *(i). Plaintiffs' factual allegations*

With respect to Plaintiff Dixie, Plaintiffs allege that Defendant Antonacci had a file on his desktop labeled "Dino Dixie." *See* Dkt. No. 1 at ¶ 29. Thus, Plaintiffs assert that Defendant Antonacci was personally monitoring his payments; although his contracts with Defendant County provided that payments would come directly from the Facilities Department. *See id.* Furthermore, Plaintiffs allege that Defendant Antonacci abruptly began to publish the results of FOIL requests on Defendant County's website after a request was directed at information regarding Plaintiff Dixie. In that regard, Plaintiff Dixie formed "the alarming impression that the FOIL request was . . . prompted . . . by Defendant Antonacci in order to develop a County custom of intimidating minority businesses through his powers as a County policymaker" by making Plaintiff Dixie's financial information publicly available. *See id.* at ¶ 32.

Moreover, before February 12, 2016, every payment from the County to Plaintiff Dixie was sent in a so-called "All-In-One" check where the check was mailed without an additional envelope and with metered postage. However, between February 12, 2016, and the filing of this lawsuit, every payment that Plaintiff Dixie has received came in an official envelope from Defendant Antonacci's office with a computer printed label and a United States Flag stamp. *See id.* at ¶ 38. According to Plaintiffs, "the absence from the All-In-One Checks of the Metered Postage Mark meant that the Defendant Antonacci never forwarded it to the County operated mailroom [but, i]nstead, purposely held back each of [Plaintiff] Dixie's payments, so that he or his employees could personally mail out the checks in line with his intimidating New Custom." *See id.* at ¶ 39.

With respect to Plaintiff Smith, Plaintiffs allege that Defendant Antonacci purposely refused to make payments to Plaintiff Smith ostensibly for procedural errors regarding two of his

projects.  *See id.* at ¶¶ 44, 47, 50.  Furthermore, Plaintiff Smith allegedly received payments for his contractual work on the War Memorial stadium in a similar fashion as Plaintiff Dixie, *i.e.*, All-In-One checks that were placed in an envelope with a stamp.[4]  *See id.* at ¶ 54.  Moreover, Plaintiffs assert that Defendant Antonacci personally showed up at the War Memorial job wearing a "County Comptroller jacket" and asked a junior painter questions about who each of the workers were at the site.  *See id.* at ¶ 55.  Plaintiffs describe this behavior as "a pattern of harassment."  *See id.*

With respect to Plaintiff Talbert, Plaintiffs allege that, a few months after he was awarded a contract to manage County parking lots, Defendant Antonacci conducted an audit of his company.  *See id.* at ¶ 62.  According to Plaintiffs, "[o]f the over fifty audits published on the Comptroller's website from January 1, 2014 to present the audit of CRC appears to be the only one against a vendor of the County."  *See id.*  Furthermore, Plaintiffs assert that Defendant Antonacci attempted to lobby the Onondaga County Legislature to revoke CRC's contract because there was a competing bid that would have paid the County $8,500 more.  *See id.* at ¶ 63.  However, Plaintiffs assert that the competing bid was from a vendor who had previously defaulted on its responsibility to Defendant County; and, further, that the competing bid was unrealistic when considering the actual revenue to be expected from managing the parking lots. *See id.* at ¶¶ 61-64.  Defendant Antonacci's tactics, according to Plaintiffs, were meant to humiliate Plaintiff Talbert by publishing press releases degrading his company without acknowledging that the competing offer was impracticable.  *See id.* at ¶ 65.  Moreover, Plaintiffs allege that Defendant Antonacci performed an unannounced inspection of Plaintiff Talbert's

---

[4] With one exception -- one check that was mailed in the normal fashion, although with a US Stamp, rather than a metered postage marker.  *See* Dkt. No. 1 at ¶ 54.

operations.  *See id*. at ¶ 67.  According to Plaintiffs, "[t]his unannounced visit exceeded Defendant Antonacci's authority and was engineered to harass and intimidate another African-American male business owner doing business with the County."  *See id*. at ¶ 68.

### (ii). Legal rules and application to the facts

A plaintiff has alleged plausible Equal Protection claims if it can demonstrate that the defendant's actions, although race neutral on their face, were "'motivated by discriminatory animus and [their] application results in a discriminatory effect.'"  *Jana–Rock Constr., Inc. v. New York State Dep't of Econ. Dev.*, 438 F.3d 195, 204 (2d Cir. 2006) (quoting [*Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886)]).  The requirement of discriminatory animus "''implies more than intent as volition or intent as awareness of consequences'''" of an action upon the plaintiff.  *Hayden*, 594 F.3d at 163 (quotation omitted).  Rather, it requires that a defendant's action was "'at least in part "because of," not merely "in spite of," its adverse effects'" upon the plaintiff by reason of that person's race.  *Id*.; *see also Grenier v. Stratton*, 44 F. Supp. 3d 197, 204 (D. Conn. 2014) (quotation omitted).  "The plaintiff need not show, however, that a government decisionmaker was motivated solely, primarily, or even predominantly by concerns that were racial[.]"  *United States v. City of Yonkers*, 96 F.3d 600, 611 (2d Cir. 1996) (citing [*Vill. of] Arlington Heights [v. Metro. Hous. Dev. Corp.]*, 429 U.S. [252,] 265, 97 S. Ct. at 563 [(1977)]).

The Second Circuit also instructs that, "[b]ecause discriminatory intent is rarely susceptible to direct proof, litigants may make 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'"  *Hayden*, 594 F.3d at 163 (quotation omitted).  In that regard, "'[t]he impact of the official action -- whether it bears more heavily on one race than

another -- may provide an important starting point.'" *Id.* (quotation omitted). However, "unless a 'clear pattern, unexplainable on grounds other than race, emerges,' . . . 'impact alone is not determinative, and the Court must look to other evidence . . . .'" *Id.* (quoting [*Arlington Heights*, 429 U.S. at 266]). In *Arlington Heights*, the Supreme Court identified a non-exhaustive list of some factors courts should consider when determining whether a racially discriminatory intent existed, including (1) the historical background of the decision, (2) departures from the normal procedural sequence, (3) substantive departures, and (4) the legislative or administrative history. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977).

As is apparent from the face of the complaint, there is no direct evidence that conclusively links Defendant Antonacci's actions with a racially illicit motive. Viewed in one light, all the actions could reasonably be seen as nothing more than the County Comptroller taking his job seriously. However, at the motion to dismiss stage, the Court's role is ask whether there is sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted). The Second Circuit has further instructed that "[t]his standard is 'applied with particular strictness when the plaintiff complains of a civil rights violation.'" *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994) (quoting *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991)). Bearing this in mind, the Court denies Defendant Antonacci's motion to dismiss because Plaintiffs have plausibly pled viable equal protection claims against him.[5]

---

[5] The Court notes that, without further evidence of discriminatory intent, Plaintiffs' claims would likely fail to survive a motion for summary judgment. However, at this stage of the litigation, accepting Plaintiffs' allegations as true, Plaintiffs have, albeit barely, stated a plausible equal protection claim against Defendant Antonacci.

First, the payment procedure regarding the All-In-One checks could reasonably be seen as a ploy that Defendant Antonacci designed as a subtle way to inform Plaintiffs Dixie and Smith that he was monitoring their accounts personally. Although at this point there is no indication that Defendant Antonacci did not universally employ this policy, if Plaintiffs were able to prove that Defendant Antonacci departed from normal procedures and singled out African-American contractors for this treatment, they would likely be entitled to relief.

Furthermore, Plaintiff Smith alleges that Defendant Antonacci purposefully withheld payments without regard to the terms of his agreed-upon contract. Again, there is no direct evidence that Defendant Antonacci's decision was racially charged, but viewing the facts in the light most favorable to Plaintiffs, this substantive departure from his role as Comptroller provides at least an inference of discrimination substantial enough to defeat a motion to dismiss.

Perhaps most dramatically, Plaintiff Talbert has alleged that Defendant Antonacci publicly advocated for revoking his contract with Defendant County, arguing instead that Defendant County should have accepted a bid from a company with close ties to a previously defaulted contractor. In their complaint, Plaintiffs quote Onondaga County Legislator Linda Ervin as stating that

> [Defendant] Antonacci came to us a year ago [about CRC] and the legislature didn't agree with him . . . . I don't know but it has been an unprecedented hands-on questioning and approach, to discredit and revoke the contract the county has with Cheyenne Realty. I feel badly, because I worked with legislator Monica Williams to push to have more minority contractors bid on county contracts. I feel these types of actions by the comptroller will deter them.

*See* Dkt. No. 1 at ¶ 64.

A reasonable inference that a factfinder could draw from Ms. Ervin's statement is that race played a role in Defendant Antonacci's crusade to revoke Plaintiff Talbert's contract. Indeed,

because of Defendant Antonacci's tactics, Plaintiff Talbert filed a complaint with the local NAACP, the County Executive, the County Legislature, and his local legislator. *See id*. at ¶ 71.

In addition, the complaint alleges, in multiple places, that Defendant Antonacci exceeded the scope of his authority in the manner in which he treated Plaintiffs. *See id*. at ¶¶ 51, 55, 64, 68. For example, Plaintiffs allege that Defendant Antonacci harassed Plaintiff Talbert by sending an unannounced inspector to his parking lots and requesting information that was beyond the scope of his authority.

In sum, Plaintiffs have adequately alleged a factual basis that supports a reasonable inference that Defendant Antonacci intentionally discriminated against them because of their race. Therefore, the Court denies Defendant Antonacci's motion to dismiss.


### 4. *Qualified immunity*

As discussed above, Plaintiffs have alleged plausible equal protection claims against Defendant Antonacci; therefore, his defense of qualified immunity must fail at this stage because it is clearly established that Defendant Antonacci cannot intentionally erect discriminatory barriers that impact Plaintiffs because of their race.


### 5. *Punitive damages*

As Defendant Antonacci suggests, "[p]unitive damages may be available in section 1983 actions when conduct is motivated by evil motive or intent or when it demonstrates reckless or callous indifference to federally protected rights." *Meriwether v. Coughlin*, 879 F.2d 1037, 1048 (2d Cir. 1989) (citing *Smith v. Wade*, 461 U.S. 30, 56, 103 S. Ct. 1625, 1640, 75 L. Ed. 2d 632 (1983)). At this stage of the litigation, the Court denies Defendant Antonacci's motion to dismiss

any claim for punitive damages because this issue should be decided on a full record, *i.e.*, on summary judgment, because Defendant Antonacci's actions are not outside all plausible inferences of reckless indifference to Plaintiffs' rights. *See, e.g., Parrott v. Krasicky*, No. 3:12CV820, 2013 WL 3338570, *5 (D. Conn. July 2, 2013) (denying motion to dismiss a punitive damages claim at the motion to dismiss stage).

## IV. CONCLUSION

Having reviewed the entire file in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant Onondaga County's motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, *see* Dkt. No. 12, is **DENIED**; and the Court further

**ORDERS** that Defendant Antonacci's motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, *see* Dkt. No. 11, is **GRANTED** insofar as he moves to dismiss Plaintiffs' claims against him in his official capacity but **DENIED** in all other respects; and the Court further

**ORDERS** that this matter is referred to Magistrate Judge Dancks for all further pretrial matters.

**IT IS SO ORDERED.**

Dated: May 24, 2017
      Syracuse, New York

Frederick J. Scullin, Jr.
Senior United States District Judge